UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:19-cv-186-MOC-DSC

| | |
|---|---|
| SPENCER SPIRIT HOLDINGS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | **ORDER** |
| ) | |
| SUNRISE ROOFING, INC., et al., ) | |
| ) | |
| Defendants. ) | |

**THIS MATTER** is before the Court on a Motion for Partial Summary Judgment filed by Plaintiff Spencer Spirit Holdings, Inc. against Defendant Sunrise Roofing, Inc., (Doc. No. 73), and on a Motion for Summary Judgment filed by Sunrise Roofing.[1] (Doc. No. 74). The Court held a hearing on the motions on October 21, 2020.

## I. BACKGROUND

This action arises out of a partial roof collapse at a distribution facility leased by Plaintiff Spencer Spirit Holdings, Inc. in Charlotte, North Carolina, during an intense rainstorm on September 1, 2016. Plaintiff alleges that Defendant Sunrise Roofing's improper installation of the roof in July 2014 caused the collapse. Plaintiff alleges, among other things, that Defendant negligently re-roofed the facility without a secondary drainage system to drain accumulated water, thus failing to comply with the North Carolina Building and Plumbing codes and industry standards. Plaintiff further asserts that Defendant knew that the roof's primary drains were severely clogging and not functioning due to goose droppings and feathers. (Doc. No. 31).

---

[1] The claims against Defendants S.A. Alsan & Associates, Jones Lang Lasalle and Asset Management were resolved and these Defendants have been voluntarily dismissed.

In response, Defendant asserts, among other defenses, contributory negligence by Plaintiff and the intervening, superseding, and insulating negligence of third parties. Plaintiff seeks partial summary judgment on the issues of Defendant's negligence and negligence per se, as well as Defendant's asserted affirmative defenses of contributory negligence and intervening, superseding, and insulating negligence. Plaintiff does not seek partial summary judgment as to damages.

Plaintiff's summary judgment evidence shows that at all relevant times, STAG GI owned the distribution facility and leased the facility to Plaintiff. (Doc. No. 31 at 8–9: Amended Compl.; Doc. No. 27 at 8, 10: STAG GI Answer to Amended Cross Claim by the Alsan Group). The distribution facility originally included approximately 300,000 square feet (hereinafter referred to as the "original warehouse"). (Doc. No. 67-2: Alan Campbell's Report; Doc. No. 67-3: Louis Hackney Report; Doc. No. 70-2 at 3: Defendant's Response to Request for Admission). An addition was constructed on the southside of the distribution facility. (Doc. No. 70-2 at 4).

The original warehouse roof slopes from the northwest to the southwest. Because the warehouse addition is taller than the original warehouse, there are internal roof drains along the intersection between the buildings to drain the original warehouse roof. (Doc. No. 67-2; Doc. No. 67-3). STAG GI contracted with Defendant as a roofing contractor to re-roof the original warehouse ("the Roof") in three phases between 2012 and 2014. (Doc. No. 70-2 at 5: Def.'s Response to Request for Admission; Steve Wilson Dep., attached as Ex. 1 at p. 40:19–25).

STAG retained the Alsan Group to serve as the roofing consultant on the re-roofing project. Art Tafil was the Alsan Group's representative on the project. (Doc. No. 33 at 11: Alsan Answer to Amended Compl.; Steve Wilson Dep., Ex. 1 at p. 40). At all relevant times, the

North Carolina State Building Code,[2] N.C. GEN. STAT. § 143-138, adopted the North Carolina Plumbing Code (2012 edition).[3]  (Doc. No. 70-2 at 6; Doc. No. 67-2).  When Defendant conducted the roofing work between 2012 and 2014, the 2012 North Carolina Building Code, 2012 North Carolina Administrative Code, and 2012 North Carolina Plumbing Code were each in effect and enforced in Mecklenburg County, Charlotte, North Carolina, and applied to Defendant's roofing work.  (Doc. No. 67-2; Doc. No. 70-3 at p. 61: Portions of Louis Hackney's Dep.; Doc. No. 70-2 at 6–8; Doc. No. 70-1: Mecklenburg County Land & Environmental Services Agency Code Enforcement Officer Tommy Rowland November 9, 2017 Letter).

The 2012 North Carolina Plumbing Code, Section 1107.1 Secondary Drainage Required states: "Secondary (emergency) roof drains or scuppers shall be provided where the roof perimeter construction extends above the roof in such a manner that water would be entrapped should the primary roof drains allow build-up for any reason."  (Doc. No. 67-2; NC Plumbing Code; Ex. 3 at p. 1, 81–85).  Section 1101.7 of the North Carolina Plumbing Code imposed a duty on Defendant to install secondary drainage system (i.e., secondary roof drains) to sustain the load of rainwater that accumulated on the roof.  (Doc. No. 67-2: Louis Hackney Dep. Tr. attached as Ex. 4 at pp. 205:22–25; 206:6–7; 213:21–24; Doc. No. 70-1: Tommy Rowland November 9, 2017 Letter).

The 2012 North Carolina Building Code, Section 1503.4.1, Secondary Drainage Required states:  "Secondary (emergency) roof drains or scuppers shall be provided where the roof

---

[2]  The purpose of the North Carolina Building Code is to "establish the minimum requirements to safeguard the public health, safety and general welfare…."  (Portions of 2012 North Carolina Building Code attached as Ex. 2 at pp. 1, 291–92).

[3]  "The purpose of this [North Carolina Plumbing] code is to provide the minimum standards to safeguard life or limb, health, property and public welfare . . . ."  (Portions of NC Plumbing Code, attached as Ex. 3 at pp. 1, 81–85).

3

perimeter construction extends above the roof in such a manner that water will be entrapped if the primary drains allow buildup for any reason." (Doc. No. 67-2; Doc. No. 70-3; Doc. No. 70-1; NC Building Code, Ex. 2).

Secondary roof drains are intended to protect the roof from accumulating water in case the primary drains are clogged for any reason. (Doc. No. 69-2 at 64:3–20: Alan Campbell Dep.; Ex. 4 at p. 227:6–20: Louis Hackney Dep.). It is undisputed that Defendant's failure to install secondary roof drains as part of the roofing work failed to comply with the North Carolina Building and Plumbing Codes as they existed at the time. (Doc. No. 67-2; Ex. 4 at 61:15–23; 62:2–4: Louis Hackney Dep.). Furthermore, the contract between STAG and Defendant required Defendant to obtain a building permit for its roofing work. (Doc. No. 67-2; Ex. 5 at pp. 14:8–25; 15:3-25; 16:1–6: Patricia Wilson Dep.). The 2012 North Carolina Administrative Code required Defendant to obtain building permits from the Charlotte/Mecklenburg County Building Department, Code Enforcement for Defendant's roofing work of the original warehouse during the timeframe of 2012 to 2014. (Doc. No. 67-2; Ex. 4 at p. 146:19–22, 147:1; Doc. No. 70-1). No permits were either issued by the Charlotte/Mecklenburg Building Department or obtained by Defendant in conjunction with Defendant's roofing work during the timeframe of 2012 to 2014. (Doc. No. 67-2; Doc. No. 70-1; Doc. No. 7-2 at 14–15).

On September 1, 2016, during an intense rainstorm, a portion of the roof installed by Defendant in 2014 collapsed, causing substantial damage to Plaintiff's personal property and business interests. (Doc. No. 67-2; Doc. No. 67-3). The roof collapsed under the weight of accumulated rainwater. (Doc. No. 67-2; Doc. No. 67-4: Alan Campbell's Supplemental Report; Doc. No. 69-2 at 197:6–12: Alan Campbell's Dep.; Ex. 4 at p. 142:12–18). Defendant did not install secondary roof drains as part of its roofing work and no secondary roof drains existed on

the roof when the roof collapsed. (Doc. No. 67-2; Doc. No. 67-3). When the roof collapsed, the primary roof drains servicing the roof were obstructed with geese droppings and feathers. (Doc. No. 67-2; Doc. No. 67-3).

Defendant was aware during its roofing work and thereafter that geese droppings and feathers were obstructing the primary roof drains and causing water to pond on the roof. (Ex. 1 at p. 61:15–25; 62; 63:1: Steve Wilson Dep.). Acknowledging that the primary roof drains were being obstructed by geese droppings and feathers and causing ponding water on the roof, Defendant installed tapered insulation (also known as "crickets") on the roof to divert water to the primary roof drains. (Ex. 1 at p. 61: 15–25; 62; 63:1).

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his

5

pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

### III. DISCUSSION

#### A. Defendant's Negligence and Negligence Per Se

To state a claim for common law negligence, a plaintiff must allege: (1) a legal duty; (2) a breach of that duty; and (3) injury proximately caused by the breach. Stein v. Asheville City Bd. of Educ., 360 N.C. 321, 328 (2006). "A safety statute or a safety regulation having the force and effect of a statute creates a specific duty for the protection of others." Baldwin v. GTE S., Inc., 335 N.C. 544, 546 (1994) (internal citations omitted). "A member of the class intended to be protected by a statute or regulation who suffers harm proximately caused by its violation has a claim against the violator." Id. at 546–47. "[T]he general rule in North Carolina is that the violation of a [public safety statute] constitutes negligence per se." Stein, 360 N.C. at 326 (alterations in original) (quoting Byers v. Standard Concrete Prods. Co., 268 N.C. 518, 521 (1966)).

#### i. Duty

6

North Carolina law provides that, as a roofing contractor, Defendant owed the same duty as any other contractor to exercise reasonable care to the building owner, as well as the building's tenant/occupier, here Plaintiff, when conducting its re-roofing activities so as to avoid harm to life, welfare, and property. North Carolina courts have consistently held that the law imposes on every person who enters upon an active course of conduct the positive duty to exercise ordinary care to protect others from harm and calls a violation of that duty negligence. Fireman's Mut. Ins. Co. v. High Point Sprinkler Co., 266 N.C. 134, 140 (1966) (quoting Counsel v. Dickinson's Inc., 233 N.C. 472, 474 (1951)). Moreover, where there is a violation of a safety statute, the traditional role of the jury in determining whether the plaintiff has set forth a prima facie case of negligence is superseded, and the defendant-violator is considered to be negligent as a matter of law, or negligent per se. See, e.g., Estate of Coppick v. Hobbs Marina Props., LLC, 240 N.C. App. 324 (2015).

Here, Defendant had a duty to adhere to the North Carolina Building and Plumbing Codes and to use reasonable care in re-roofing the roof, including the installation of secondary roof drains, as required by the codes.

**ii. Breach of Duty**

Defendant re-roofed the subject roof in three phases between 2012 and 2014. It is undisputed that Defendant failed to install code-mandated secondary roof drains or obtain an exemption from doing so from the Charlotte/Mecklenburg Building Department. Plaintiff's roofing/structural engineering expert Alan Campbell investigated the roof collapse. Mr. Campbell concluded in his reports that the roof collapsed because of the accumulation of water and inadequate drainage of the roof during an intense rainstorm. Since the primary roof drains were obstructed due to geese droppings and feathers and there were no secondary roof drains, the

7

accumulated water overloaded the roof structure and the collapse occurred. Similarly, Steve Wilson, one of Defendant's Rule 30(b)(6) designees, testified:

> Q. Well, if the water's not able to get off the roof for whatever reason and the drains are 100 percent clogged and the water's not able to –
> A. If it's definitely 100 percent clogged, sure, it would be a lot of weight up there.
> Q. And that could be a potential risk for collapse?
> Mr. Keister: Objection. You can answer.
> A. It could be along with a lot of other things too.

(Ex. 1, Steve Wilson Dep. at 73:20–25; 74:1–2).

Louis Hackney, Defendant's only testifying expert, has agreed that the North Carolina Building and Plumbing codes applied to Defendant's roofing work at the distribution facility, that secondary drains were required to be installed by Defendant as part of its work, that the lack of secondary drains allowed water to accumulate on the roof, and that this accumulation of water was a contributing cause of the collapse.

### iii. Proximate Cause and Foreseeability

For a particular damage to be recoverable in a negligence action, the plaintiff must show that the damage was proximately caused by the defendant's negligence. For an act of negligence to proximately cause the damage, the fact finder must find that the negligence was both the cause in fact of the damage and reasonably foreseeable. Hawkins v. Emergency Med. Physicians of Craven Cty., PLLC, 240 N.C. App. 337 (2015). Plaintiff seeks partial summary judgment based its argument that the lack of secondary roof drains was a (as opposed to the) proximate cause of the roof collapse, arguing that, under North Carolina law, "there may be two or more proximate causes of an injury." Batts v. Faggart, 260 N.C. 641, 644 (1963); see also Pugh v. Smith, 247 N.C. 264, 265 (1957) (stating that "it is only necessary for the plaintiff to show that the defendant's negligence was one of the proximate causes of the injury").

### B. Defendant's Contentions in Opposition

8

In its Opposition, Defendant argues that there are genuine issues of fact precluding summary judgment, and they are mostly directed at the issue of proximate cause. Defendant argues, specifically, that (1) its failure to install code mandated secondary roof drains was not a proximate cause of the collapse; (2) it had no reason to foresee that the primary roof drains would become clogged due to alleged poor roof maintenance by the building owner, STAG GI; and (3) that it was otherwise excused from complying with the North Carolina Building and Plumbing codes because it heard that STAG GI did not want to fund the installation of the secondary drains.

The Court first finds that, contrary to Defendant's first contention, the evidence establishes that the lack of secondary roof drains was, indeed, a proximate cause of the roof collapse. Plaintiff has offered substantial evidence in support of this proposition, including the testimony of Defendant's own expert Louis Hackney, who conceded that the lack of secondary roof drains was a proximate cause of the roof collapse. (Doc. No. 67-2, Ex. 4 at pp. 138:18–25, 139:1–8, 228:1–15, 231:3–23, 150:14–18). The evidence further supports a finding that if Defendant had installed secondary roof drains as part of its roofing work, water would not accumulated on the roof during the rainstorm, and the collapse would probably not have occurred. (Doc. No. 67-2, Ex. 4 at pp. 142:2–11; 12–18; 203:11–25; 1–18). Louis Hackney, Defendant's own roofing expert, testified that the lack of code-mandated secondary roof drains was a contributing cause of the collapse.[4] Mr. Hackney testified as follows:

---

[4] In its opposition to Plaintiff's Motion to Extend Scheduling Order Deadlines, Defendant attempted to undermine its own expert's testimony by claiming that Mr. Hackney's concessions should be discounted as he did not use the term "with reasonable certainty" in expressing his opinions that the lack of secondary roof drains was a contributing cause of the roof collapse. (Doc. No. 72 at p. 7). However, there is no requirement for an expert to recite the magic words of "reasonable degree of certainty" for such testimony to reach the jury. See Jordan v. Iverson Mall Ltd. P'ship, 2018 WL 2391999, at *6 (D. Md. May 25, 2018) ("[T]here is no requirement

9

Q. If there's obstruction of the primary drains, and it's not working as it was designed to work, whether fully obstructed or partially obstructed, and you do not have secondary drains, that condition contributed to the collapse, correct?

A. I wouldn't say it in that way. I would say that there is some level of secondary drainage at the north end and south end of the roof. So what I would say is that, to try to put in context of the question you're asking me, if the primary drains are obstructed, even though there is some drainage at both ends of the roof, there is some water accumulation that likely contributed to the collapse, because it added weight to the system which allowed the structural deficiency to fail.

\*\*\*\*\*\*

Q. Did the absence of secondary drains contribute in any way to the collapse?

MR. KEISTER: Objection. You can answer.

A. I think it, yes, I think it could have. I think had there been secondary drains, then there with have been very limited accumulation of water on the roof, most likely limited accumulation.

Q. So if there were secondary drains installed at the time of the collapse, am I correct that it would be unlikely there would have been a collapse on that day?

MR. KEISTER: Objection to form. You can answer.

A. Yes, I believe so.

\*\*\*\*\*\*

Q. And if it hadn't rained that day, September 1, 2016, the building would not have collapsed – that roof would not have collapsed that day, right?

A. Correct.

Q. So you have a combination of weakness in structural connections and the accumulation of water on the roof to cause the collapse, right?

A. Yes. One doesn't happen without the other. However, in the absence of that structural connection being an issue, I think the water would not have gotten to a height that would have caused the trusses to fail.

Q. And if there were secondary drains located on the roof next to the primary drains, you would never have had an accumulation of water, even with the deflection of the trusses and joists?

Mr. Keister: Objection.

Q. Right?

A. That's correct. You would not have had as much accumulation of water.

\*\*\*\*\*\*

Q. Do you agree with me that there could be multiple contributing causes of the collapse?

A. Well, yes. I mean, we've talked about the fact that, in the absence of water weight, the collapse likely wouldn't have occurred. So yes.

(Ex. 4 at pp. 228:1–15, 138:18–25, 139:1–8, 231:3–23, 150:14–18).

---

that an expert use any 'magic words' for their opinion to be admissible. However, the expert's testimony taken as a whole must still demonstrate that the expert is confident in his or her opinion to a reasonable degree of certainty ….").

10

Defendant has not identified any record evidence from which a reasonable fact-finder could conclude that the distribution facility roof would have collapsed if the secondary drains were present. In sum, Defendant has not produced any significant, probative evidence, by expert opinion or otherwise, to dispute Plaintiff's evidence of Defendant's negligence and negligence per se. Therefore, as a matter of law, Defendant breached its duty to exercise reasonable care.

As to Defendant's contention that it is not liable for its own negligence because of the intervening, superseding, or insulating negligence of third parties, Defendant contends, for instance, that it had no reason to foresee that the primary roof drains would become clogged due to alleged poor roof maintenance by the building owner, STAG GI.[5] For the following reasons, the Court disagrees.

The North Carolina Supreme Court has held that to insulate the negligence of one party, the intervening negligence of another must break the sequence or causal connection between the negligence of the first party and the injury, so as to exclude the negligence of the first party as one of the proximate causes of the injury. Hairston v. Alexander Tank & Equip. Co., 310 N.C. 227, 236 (1984) (citing Harton v. Forest City Tel. Co., 141 N.C. 455, 462 (1906)). An efficient intervening cause is a new proximate cause. It must be an independent force that entirely supersedes the original action and renders its effect in the chain of causation remote. Id. Thus, although there may be more than one proximate cause, that which is new and entirely independent breaks the sequence of events and insulates the original or primary negligence.

---

[5] Defendant also raised contributory negligence as a defense, but the defense was raised as to other Defendants and not Plaintiff. Indeed, Plaintiff, as the tenant, was not responsible for building and maintaining the roof. Significantly, Defendant's own expert, Mr. Hackney, offered no opinion as to whether Plaintiff met its standard of care in this matter or whether Plaintiff's actions contributed to the roof collapse in his report. (Ex. 4 at p. 215:13–16). Moreover, Defendant has abandoned this defense in its response to Plaintiff's motion for partial summary judgment.

11

Here, both parties acknowledge that it was important to control the depth of water that could accumulate on the roof.  Controlling this depth is a function of the overflow drainage system or, as it is frequently referred to, the secondary drainage system.  As the Court has discussed, secondary roof drains are prominently mentioned and are required in the North Carolina building and plumbing codes. These codes were adopted and enforced in Charlotte/Mecklenburg County at all relevant times to Defendant's roofing work.

At some point it was likely that a roof drain(s) on the roof was going become blocked. Here, geese droppings and feathers blocked the drains.  In any event, the primary drainage system would likely become blocked.  That is precisely why the building and plumbing codes require secondary roof drains to be installed to remove the accumulated water from the roof and prevent the overloading of the roof structure.

A third party's intervening acts do not break the casual chain if the acts were foreseeable. Defendant knew or should have known that it was required to install code mandated secondary drains as part of its work.  Moreover, Defendant recognized the hazard posed by geese droppings/feathers clogging the primary roof drains and causing an accumulation of water on the roof.  Indeed, Defendant witnessed this happening while it was working on the roof.  Mr. Wilson testified:

> Q. And, at what point, did you discuss the geese issue with Mr. Tafil?
> A. I think I discussed it in the very beginning because before we even started Phase 2, we went in and took a dump truck load of geese whatever off the roof.  I mean, it was –
> Q. It was a serious issue –
> A. We had to go around with a wheelbarrow and a shovel and get like a whole dump truck load.  And actually, before we did the roof where the ponding water was, it would turn to like a liquid manure tea, I guess you would say.  And so anything that leaked, would absolutely rust the metal a lot worse than plain water.
> Q. Where was the ponding that you saw?
> A. It was along this wall where the addition is.
> ******

12

> Q. During the course of your work on the project, Phase 2, Phase 3, did you ever see the strainers clogged with geese feathers?
> A. I don't remember it on the areas –
> Mr. Keister: Objection. You can answer.
> A. --- but the old areas where the ponding water was and water was standing, it was.
> Q. That's Phase 2 and 3?
> A. Well, the portions I had finished, I didn't see any, but the old parts, I did.
> Q. Right. So when you finished Phase 1 and now you're going to start Phase 2 and 3, those new phases, before you started working on them, you saw that the geese were congregating and clogging up the drains?
> A. Yes.

(Steve Wilson Dep., Ex. 1 at p. 60:10–24, 103:11–25).

Defendant then undertook steps to alter the design of the roof drainage system by installing tapered insulation/crickets on the roof. (Id. at p. 61:7–25; 62:8–17, 64:16–23; 66:9–25; 67:1–25). Mr. Tafil with Alsan & Associates further testified to this point:

> Q. And so both Sunrise and you installed or decided on a design that would include crickets to divert water?
> A. That's correct. Not so much to divert water; to force it where it had to go, down to the drains.

(Art Tafil Dep., attached as Ex. 6 at p. 124:1–6).

Further, having recognized the hazard of accumulating water on the roof due to clogged roof drains, Defendant asked Mr. Tafil whether it could add additional primary drains to the roof. Mr. Wilson testified:

> Q. Did it concern you that there's an active geese issue on the roof that resulted in feathers and excrement clogging the strainers and preventing the roof from properly draining, did that concern you at all?
> A. Absolutely.
> \*\*\*\*\*\*\*
> Q. Was there any discussion with Mr. Tafil about the need for secondary drains for their roof that you were working on?
> A. --- I told them it would be very nice to have more drains and he told me it was totally out of the budget.
> Q. And this all verbally, right?
> A. Verbally, yes, sir. . . . . I just suggested more drains. I didn't put the word, you know, overflow, anything.

13

(Steve Wilson Dep., Ex. 1 at pp. 58:20–24, 66:9–17, 67:3–4).

Although Defendant knew it was required to obtain a building permit for its roofing work, which would have triggered an inspection and review of its roofing work by the Charlotte/Mecklenburg Building Department, Defendant chose not to obtain one. (Patricia Wilson Dep., Ex. 5 at pp. 15:9–25; 16:3–6; Louis Hackney Dep., Ex. 4 at pp. 146:19–25; 147:1). None of Defendant's contentions of intervening, superseding or insulating negligence of third parties was unforeseeable to block the causal connection between Defendant's negligence and the roof collapse. It was reasonably foreseeable to Defendant that there could be contributing causes to the roof collapse (such as alleged structural weakness with the building) if the roof drains were obstructed for any reason and water ponded on the roof. This is true given that Defendant was aware of the history of the severe clogging of the roof drains by geese droppings and feathers and the building and plumbing codes required it to anticipate that the roof drains would become blocked for any reason and add secondary drains as a result.

Defendant's argument that there is a genuine issue of material fact concerning proximate cause fails. Both parties' experts agree that the primary roof drains were clogged and water built up to a level on the roof that the roof could not sustain the weight of that water. They also agree that the lack of code mandated secondary (emergency/overflow) drains, which are intended to activate if the primary drains are clogged for any reason, would have prevented the water accumulation. Alan Campbell opined that the water accumulated to such a degree to overload the steel bar joists supporting the roof: "The absence of a secondary (emergency) drainage

14

system as required by the applicable building code [was] the fatal flaw that caused [the] roof collapse." (Doc. No. 67-2 at 22).[6]

Additionally, defense expert Louis Hackney opined that there were pre-existing structural weaknesses with the building which combined with the accumulation of water to cause the collapse.[7] Mr. Hackney testified:

> Q: What I'm asking you is: You have a structural deficiency that you've identified, and you have an accumulation water on the roof coming together to cause a collapse; is that correct?
> A. Yes.

(Doc. No. 73-5 at 151:9–13: Hackney Dep.). Here, both parties' experts agree that secondary roof drains would have prevented the water accumulation and roof collapse. Mr. Hackney testified that "had there been secondary drains, then there would have been very limited accumulation of water on the roof …" (Hackney Dep., Doc. No. 73-5 at 138:22–25). He also testified that if there were secondary drains installed at the time of the collapse, there would not have been the collapse that day. (Hackney Dep., Doc. No. 73-5 at 139:3–8). The parties disagree on the amount of standing water that developed during the rainstorm and whether the building components or the roofing system failed first to initiate the collapse. For instance, Mr. Campbell opined that the maximum amount of accumulated water during the storm was 10-14 inches, (Doc. No. 67-2), whereas Mr. Hackney opined that the maximum amount of accumulated water during the storm was roughly 4 5/8 inches. (Doc. No. 67-3). In any event, the findings

---

[6] The roof system consists of a single-ply TPO over polyisocyanurate (iso) insulation, over EPDM seams and battens, over wood fiberboard, over a multi-ply built-up roof (BUR) membrane, over a layer of fiberglass roof insulation, and installed on steel roof decking above steel bar joists.

[7] The main load carrying system for the original warehouse (the portion of the facility where the collapse occurred) consists of steel bar girders, steel bar joists, and structural steel columns supported above concrete footings and a slab-on-grade. The exterior walls consist of precast concrete double tee wall panels.

15

and opinion common to both experts is that the lack of secondary/overflow drains allowed the water to build up to cause the collapse.[8] Mr. Hackney testified that "... the rain event is always part of the weight that overwhelmed the weakest structural element." (Doc. No. 75-3 at 58:23–25: Hackney Dep.).

Defendant argues, however, that, given STAG GI's alleged poor roof maintenance in cleaning the roof drains, it was possible that even if Defendant had installed secondary drains, those secondary drains could have become clogged with geese droppings and ineffective during the rainstorm. (Doc. No. 76 at 9–10). Nowhere did Mr. Hackney opine as such in his report, nor did he address the building owner's standard of care in his report.[9] Thus, such speculation and conjecture offered now by Defendant is insufficient to create a genuine issue of material fact to establish that had Defendant actually installed secondary drains, those drains would have been non-functioning during the rainstorm. "The nonmoving party . . . cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985).

Defendant also argues that it could not foresee that poor roof maintenance after it left the roofing project allowed the geese droppings to continue to clog the drains. However, Defendant concedes that it knew that the roof drains could become blocked, stating in its opposition brief: "Sunrise has some general awareness of a pre-existing goose issue." (Doc. No. 76 at 14: Def.'s

---

[8] Mr. Hackney testified: "So in general, water plays an element, and the weight of water plays an element, but that doesn't mean that there can't be one in which drainage was the only cause." (Hackney Depo, Doc. No. 75-3 at 114:24–25; 115:1–2).

[9] Although Alan Campbell was asked to speculate about the potential for the secondary drains to clog with geese droppings if they had actually been installed by Defendant, he testified that it would be unlikely given that the secondary drains are installed with a collar and sit two inches higher than the primary drains/deck on the roof. (Doc. No. 76-3 at 75:11–25; 76:1–16: Alan Campbell Dep.).

16

Opposition Br.). Moreover, not only did Defendant have to remove truckloads of geese droppings from the roof, at some point STAG GI's property manager, Asset Management, contacted Defendant to inquire how to address the ongoing "goose issue." See (Pat Wilson Dep., attached as Ex. 1 at 30:20–24).

Finally, as part of its argument that it did not breach any duties owed to Plaintiff, Defendant contends that it was excused from installing the code-mandated, secondary drains because roof consultant Art Tafil told Steve Wilson (with Defendant) that STAG GI told him that it did not want to spend the money to add "additional drains":

> Q. So a decision was made not to add any additional drains or secondary drains?
> ******
> Q. Is that correct?
> A. Basically on the budget, yeah.
> Q. That's what you were told by Mr. Tafil?
> A. I was told it would be so much money in the budget and it was no way.

(Steve Wilson Dep., Doc. No. 76-5 at 157:4–12; Defendant Opposition, Doc. No. 76 at 10–12).[10]

The Court first finds that Mr. Wilson's testimony is inadmissible hearsay and may not be considered on a motion for summary judgment. U.S. Dep't of Hous. & Urban Dev. v. Cost Control Mktg. & Sales Mgmt. of Va., Inc., 64 F.3d 920, 926 (4th Cir. 1995) (noting that hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment). In any event, pursuant to N.C. GEN. STAT. § 143-138, the North Carolina Building Code establishes the minimum standards for the construction of buildings and structures and the installation of particular facilities therein "for the protection of the occupants of the building or structure, its neighbors, and member of the public at large." N.C. GEN. STAT. § 143-138(b). The

---

[10] Defendant failed to submit any written documentation reflecting the alleged conversation between Mr. Tafil and STAG GI that STAG GI would not authorize the installation of code-required secondary drains.

North Carolina Building/Plumbing Code is a public safety statute that imposes a specific duty for the protection of others. See Stein, 626 S.E.2d at 266 (holding that a public safety statute is one that imposes a duty for the protection of others). As the Court has already discussed, the general rule in North Carolina is that a violation of a public safety statute constitutes negligence per se. The Code imposes liability on any person who constructs, supervises construction, or designs a structure or alteration thereto, and violates the Code such that the violation proximately causes injury or damage. Estate of Coppick, 240 N.C. App. at 329.

Regardless of whether Mr. Tafil told Mr. Wilson that the building owner would not pay for the installation of "additional" drains, an alleged oral waiver of the building and plumbing code by the owner does not preclude Defendant's liability for the North Carolina Building and Plumbing Code violation, particularly where a violation carries life-safety issues and can result in loss of property and life. Both roofing experts Hackney and Campbell uniformly testified that Defendant was not authorized to disregard its statutory obligations to comply with the building and plumbing codes. Mr. Campbell testified:

> Q. I want to make sure I understand. Is it possible that Sunrise could have reached some type of agreement with the owner to not install secondary drains that you would contend would not have Sunrise violate its standard of care as a roofer?
> Mr. Nalibotsky: Object to the form of the question.
> A. I don't see how.
> Q. So, unless they get a waiver or exemption from the building department, not putting secondary drains would be a breach of their standard of care?
> A. That is the only way it could be done …

(Doc. No. 74-3 at 58:11–25: Alan Campbell Dep.). Mr. Hackney testified:

> Q. Should the roofer have sought an exemption from the Charlotte Mecklenburg Building Department if it was not going to add secondary drains to the roof?
> A. Yes, I believe so.
> Q. And you know that that didn't happen. They did not seek an exemption from the Building Department?
> A. I'm not aware of that. Correct.

18

> Q. If Art Tafil of the Alsan Group had said to Mr. Wilson, "You don't have to comply with the building and plumbing codes," what should Mr. Wilson have done in response to that direction?
> A. I think that specific statement that, "You don't have to comply with the code," you should never assume that you don't have to comply with the code. So I don't think any contractor should assume that they don't have to comply with the code.

(Hackney Dep., Doc. No. 73-5 at 213:21–25; 214:1–11). In sum, Defendant's argument that it was excused from compliance with the North Carolina Building and Plumbing Codes has no support under North Carolina law.

For the reasons stated herein, the Court grants Plaintiff's Motion for Partial Summary Judgment and enters judgment against Defendant on Count I and Count II of Plaintiff's Amended Complaint alleging Negligence and Negligence Per se, and Defendant's Ninth and Tenth Affirmative Defenses of Contributory Negligence and Intervening, Superseding and Insulating Negligence. In other words, the Court finds there is no genuine issue of disputed fact on the issue of whether Defendant is liable for negligence in this action, and the Court rejects Defendant's defenses of contributory negligence, and intervening, superseding, and insulating negligence. To this extent, Defendant's own motion for summary judgment is denied. This Order makes no determination on the issue of damages.

## IV. CONCLUSION

For the reasons stated herein, Plaintiff's Motion for Partial Summary Judgment is granted, and Defendant's Motion for Summary Judgment is denied.

**ORDER**

**IT IS, THEREFORE, ORDERED** that Motion for Partial Summary Judgment filed by Plaintiff Spencer Spirit Holdings, Inc. against Defendant Sunrise Roofing, Inc., (Doc. No. 73), is **GRANTED**, and Defendant Sunrise Roofing's Motion for Summary Judgment, (Doc. No. 74), is **DENIED**.

19

Signed: January 25, 2021

*Max O. Cogburn Jr*
United States District Judge